*for Publication*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) CRIMINAL ACTION |
| | ) NO. 97-10213-REK |
| KENNETH M. CONLEY, | ) |
|     Defendant | ) |

Opinion
June 27, 2000

<u>Keeton, District Judge</u>.

## I.  Pending Matters

The following matters are pending for decision after documentary submissions and oral argument on April 27, 2000:

(1) Motion to Continue Stay of the Execution of Sentence (Docket No. 104, filed March 24, 2000).

(2) Motion for Reconsideration of Downward Departure (Docket No. 105, filed March 24, 2000).

(3) Motion for New Trial (Docket No. 106, filed March 24, 2000) (with Exhibits 1-10 attached) and Memorandum of the Defendant in Support of Motion for New Trial (Docket No. 107, filed March 24, 2000).

(4) Opposition of United States to Defendant's Motion for Reconsideration of Downward Departure (Docket No. 111, filed April 6, 2000).



(22)

(5) Opposition of the United States to Defendant's Motion for a New Trial (Docket No. 112, filed April 6, 2000).

(6) Defendant's Reply to Opposition of the United States to Motion for New Trial (Docket No. 118, filed April 17, 2000)

For the reasons stated in this opinion, a new trial is ordered, the motion for reconsideration of downward departure is denied, the stay of execution of the sentence is extended, and all other motions and requests are denied or dismissed as moot.

## II.   Downward Departure

At the sentencing hearing of September 29, 1998, this court found a Total Offense Level of 23 and Criminal History Category of I, resulting in a sentencing range of 46-57 months under the Sentencing Guidelines.  Based on the totality of circumstances to be considered under the Guidelines and precedents applying them, the court downwardly departed and imposed a sentence of 34 months to be served in the custody of the Bureau of Prisons.  The court rejected defendant's request for a more extreme downward departure to a sentence of probation, and rejected defendant's alternative request for a sentence at some intermediate point between probation and 34 months.

The government takes the position that the court lacks authority to re-sentence the defendant at this time, after an appeal and affirmance of the conviction and sentence.  I conclude that the government is correct in this position.  Rule 35 of the Federal Rules of Criminal Procedure provides in part (a) for prompt correction of clerical or mathematical errors, and

provides in part (b) for reduction at a later time on motion of the government grounded on substantial assistance.  Also, upon remand from a court of appeals, a trial court has authority to correct a sentence to accord with the decision of a court of appeals.  In this instance, however, the Court of Appeals for the First Circuit affirmed the conviction and sentence and remanded only for consideration of a motion for new trial, defendant having argued on appeal not for re-sentencing but primarily for reversal and in the alternative for new trial on grounds not asserted before the trial court.

Neither defense counsel nor the court has found any provision of any statute, Rule of Criminal Procedure, Sentencing Guideline, or judicial decision that would support re-sentencing at this time.  I conclude that the Motion for Reconsideration of Downward Departure (Docket No. 105) must be DENIED.

## III.   The Legal Standard for a New Trial Because of Newly Discovered Evidence

A motion for a new trial may be granted if the court finds that "the interests of justice so require."  Fed.R.Crim.P. 33.  The remedy of a new trial must be used sparingly, and only where a miscarriage of justice would otherwise result.  See United States v. Rothrock, 806 F.2d 318, 322 (1st Cir. 1986).

As a general rule, four requirements must be met before a court may grant a new trial on the ground of newly discovered

evidence: (1) the evidence must have been unknown or unavailable
to the defendant at the time of trial; (2) the defendant must
have been duly diligent in attempting to unearth it; (3) the
newly discovered evidence must be material; and (4) the newly
discovered evidence must be such that its emergence probably will
result in an acquittal upon retrial.  See United States v.
Wright, 625 F.2d 1017, 1019 (1st Cir. 1980); United States. v.
Huddleston, 194 F.3d 214, 218 (1st Cir. 1999).  If the defendant
fails to carry his burden with respect to any one of these four
factors, the motion for a new trial must be denied.  See Wright,
625 F.2d at 1019.  Also, a motion for a new trial based on newly
discovered evidence must be made within three years after the
verdict or finding of guilty.  See Fed.R.Crim.P. 33.

        If the newly discovered evidence was unknown to the
government and its agents, the defendant must show "an actual
probability that an acquittal would have resulted if the evidence
had been available."  United States v. Josleyn, 206 F.3d 144, 151
(1st Cir. 2000).  If, however, the newly discovered evidence was
known to the government or its agents, a different standard
applies.  In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme
Court held that "suppression by the prosecution of evidence
favorable to an accused upon request violates due process where
the evidence is material either to guilt of to punishment,
irrespective of the good faith or bad faith of the prosecution."
Id. at 89; see United States v. Cunan, 152 F.3d 29, 33 (1st Cir.

4

1998).  The prosecutor's affirmative duty to disclose such evidence is applicable even where the accused has not requested the disclosure.  See United States v. Agurs, 427 U.S. 97, 107 (1976).  Also, the Brady rule encompasses both evidence known to the prosecutor and evidence known only to police investigators.  See Kyles v. Whitley, 514 U.S. 419, 438 (1995).  This places on the prosecutor "a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." Id. at 437.

A breach of the prosecutor's duty to learn of exculpatory evidence and to disclose it does not, however, always require a new trial: "We do not...automatically require a new trial whenever a combing of the prosecutor's files has disclosed evidence possibly useful to the defense but not likely to have changed the verdict.  A finding of materiality is required under Brady." Giglio v. United States, 405 U.S. 150, 154 (1972).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985); see also Kyles, 514 U.S. at 433-434.  The Court has defined "reasonable probability" as "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of

credence." <u>Strickler v. Greene</u>, 527 U.S. 263, 289-290 (1999)
(quoting <u>Kyles</u>, 514 U.S. at 434).

When the newly discovered evidence is the existence of
perjured testimony on the part of one or more government
witnesses, the <u>Wright</u> standard applies: "The conviction should
nonetheless stand unless the force of the newly discovered event
(i.e., the fact and nature of the perjury) and the content of the
corrected testimony are such that an acquittal probably would
result upon retrial." <u>Huddleston</u> 194 F.3d at 221.  This holding,
however, applies only where the government's use of perjured
testimony was unwitting.  The Supreme Court has held that "a
conviction obtained by the knowing use of perjured testimony is
fundamentally unfair and must be set aside if there is any
reasonable likelihood that the false testimony would have
affected the judgment of the jury." <u>Agurs</u>, 427 U.S. at 103;
<u>Mooney v. Holohan</u>, 294 U.S. 103, 112 (1935); <u>Napque v. Illinois</u>,
360 U.S. 264, 269 (1959); <u>Giglio</u>, 405 U.S. at 153.  This less
stringent standard applies whether the government solicits
perjured testimony or instead merely allows it to go uncorrected
when it appears. <u>See</u> <u>Napque</u>, 360 U.S. at 269.


**IV. Background Circumstances in This Case**

**A. Introduction**

At the completion of a jury trial in June 1998, the
jury found defendant guilty of one count of perjury and one count

of obstruction of justice, also finding him not guilty of another count of perjury.

Defendant grounds his motion for a new trial on a contention that "evidence discovered after trial, and withheld by the government prior to and during trial, would have seriously undermined the testimony of each" of three witnesses (Michael Cox, Richard Walker, and Robert Brown) on whose trial testimony the Court of Appeals "relied" in affirming the conviction (Docket No. 106 at p. 2). Defendant adds the contention that "in the case of Brown and Walker, exculpatory evidence withheld from the defense allowed the government purposely to ask the jury to infer facts known by the prosecutor not to be true." Id.

## B. Conflicting Testimony in the Trial of Criminal Charges Against Conley

In his grand jury testimony, read in part into evidence in the presence of the jury at trial, Conley stated that he was the first officer in pursuit of the suspect, Robert Brown. Conley stated that he was 40 feet behind the suspect and that he climbed over the chain link fence "seconds after" the suspect did. He further testified that he did not see Michael Cox or any other plain-clothed officer chasing the same suspect ahead of him. (Tr. Vol. III at 15).

The testimony of Michael Cox, Robert Brown, and Richard Walker conflicts with Conley's account. Michael Cox testified

7

that he was "right behind" the suspect, a black male wearing a
brown leather coat, as the suspect climbed the fence. According
to Cox, the suspect's clothing became caught on the top of the
fence. Cox reached up to try to grab the suspect and pull him
back over the fence, but the suspect was able to free himself
from the fence and drop to the ground on the other side. Once
Cox saw the suspect land on the other side of the fence, Cox
stepped back from the fence briefly and then put his hands up on
the fence to gauge how difficult it would be to climb. At that
point he felt a "sharp blow" to the back of his head, followed by
further blows. Cox testified that up to the time he was
assaulted, he did not see anyone else go over the fence after the
suspect. (Tr. Vol. I at 76 - 78, 85).

Robert Brown testified that after getting out of the
Lexus he ran toward the fence. Brown testified that a black man
wearing black clothing was following closely behind him. Brown
began to climb over the fence, and in the process, caught his
clothing on the top of the fence. As he sought to free his
clothing from the fence, he felt someone touch his foot. He
managed to free himself from the fence and land on the other
side. He then fell down a small incline and hit a tree. While
still on the ground, Brown looked back at the fence and saw the
black man dressed in a "black hoody" who had been following
closely behind him reach for the fence. As the man did so, a
black uniformed police officer hit him twice over the head with

8

an object shaped like a pipe.  Then at least three to four other
officers began beating the man as well.  Brown started to stand
up and saw a tall white plain clothes officer looking at him.
The tall white officer then ran toward the hole in the fence
toward Brown.  Brown began to run and was eventually caught by
the tall white officer. (Tr. Vol. II at 93-102).

Richard Walker testified that he saw two men run toward
the fence.  The first was a suspect dressed all in brown, and the
second was Officer Cox.  According to Walker, the suspect scaled
the fence, and then Cox tried to reach for him.  The suspect made
it over the fence successfully and then fell down the incline.
Walker left the car and ran toward a hole in the fence.  As he
did so, he saw Cox reach for the fence.  Walker proceeded through
the hole and down the incline, falling a couple of times.  He saw
two white plain clothed police officers standing in the street at
the bottom of the incline.  One was tall, about 6'2", and the
other was shorter, about 5'9".  Walker followed the tall officer
in pursuit of the suspect. (Tr. Vol. II at 30-36).

In its review of the sufficiency of the evidence, the
Court of Appeals for the First Circuit emphasized the central
importance to the verdict of this array of conflicting testimony:

> The weakness of the government's case lies in the
> absence of any direct evidence as to what Conley in
> fact observed during the early morning hours of January
> 25, 1995 in the cul-de-sac at the end of Wooodruff Way.
> But this weakness is not fatal....At trial, the
> government presented ample circumstantial evidence from

9

Case 1:97-cr-10213-WGY   Document 122   Filed 06/27/00   Page 10 of 32

which a rational jury could conclude that Conley's statements were false beyond a reasonable doubt.

By comparing Conley's testimony about the timing and location of his actions with the testimony of Cox, Walker and Brown, the jury reasonably concluded that Conley lied when he stated that he did not observe Cox chasing the suspect. Conley testified that upon arrival at the scene, he observed Brown exit from the passenger side of the Lexus, run to the right, and climb over the fence. Most significantly, Conley testified that "within seconds of seeing [the suspect] go over" the fence he scaled the fence at the same location. (Tr. Vol. III at 15; Vol II at 239).

Both Cox and Walker placed Cox at the exact same time at the exact same place where Conley claims to have climbed over the fence. According to their testimony...Cox was "right behind" Brown, approximately three feet behind him, as Brown approached the fence. When Brown reached the fence, Cox was even closer. At that point, Cox was close enough to make contact with Brown and attempt to pull him back over the fence. Brown corroborated this version of events when he testified that a black man wearing a "black hoody" was behind him as he ran toward the fence and had just started to come over the fence when he observed the black man being struck on the head by a police officer. (Tr. Vol. II at 94, 97, 98). Brown confirmed that the person behind him was close enough to make contact with his foot as he scaled the fence. (See Tr. Vol. II at 96).

Conley's testimony that he scaled the fence "within seconds" of seeing Brown go over the fence, and that he scaled the fence in the same location as Brown does not square with the testimony of Cox, Walker, and Brown. Conley's version of events provides no reasonable gap in time during which he could have missed observing Cox at the fence. Indeed, Conley concedes that if the Cox/Walker/Brown version is true, he would have seen Cox at the fence. (See Tr. Vol. II at 236). In reaching its verdict, the jury apparently found the Cox/Walker/Brown version more credible....Based on the evidence, we find that the jury was entitled to credit the testimony of Cox, Walker and Brown, and conclude that Conley's statements before the grand jury were false.

<u>United States v. Conley</u>, 186 F.3d 7, 19-20 (1st Cir. 1999).  This court must consider the defendant's allegations of newly discovered evidence in the context of the conflicting testimony at trial, described in the opinion of the Court of Appeals, and the central importance of this conflicting testimony to the verdict.

**C. The Testimony of Charles Bullard at Different Times**

**1. Times, Places, and Nature of Record or Proffer About Bullard's Testimony**

Charles Bullard, a security guard (not a Boston police officer), was seated in the backseat of an unmarked police cruiser pursuing the suspect's Lexus during the car chase ending in Woodruf Way.  Officer Craig Jones was driving, and Officer Cox was in the front passenger seat.  Bullard gave testimony at the grand jury, but he was not called as a witness at trial.  The defense claims that Bullard gave exculpatory, material testimony to the grand jury that the prosecutor subsequently suppressed in violation of <u>Brady</u>.  This contention is to some extent speculative on defense counsel's part, because he has never had the benefit of seeing a transcript of Bullard's grand jury testimony.  Nevertheless, defense counsel does have a reasoned basis for the speculation in that Charles Bullard, in December 1998, six months after the defendant was convicted, testified in a civil suit brought by Michael Cox against several officers.

11

Bullard has stated in an affidavit that, to the best of his
recollection, his testimony before the grand jury was the same as
the testimony he gave at the civil trial. (Docket No. 106,
Exhibit 2).

In the civil trial, Bullard testified that Michael Cox
got out of the passenger side of the unmarked police cruiser and
went forward toward the front of the Lexus.  Bullard testified
that he "lost track of [Cox] after that," and that he never saw
Cox run toward the fence.  (Docket No. 106, Exhibit 1, p. 109,
122).  The defense claims that Bullard's testimony that Cox went
to the front of the Lexus and not directly to the fence
"contradicted Cox and supported the defendant's statements."
(Docket No. 107 at 2).

> Bullard's testimony would have provided the exact
> puzzle piece to fit the testimony of Cox, Walker, and
> Conley.  If Cox went to the front of the Lexus first,
> the time lag in between his doing so and his pursuit of
> "the suspect" to the fence exculpates the defendant.
> The jury would have had evidence that Cox's pursuit of
> "the suspect" was not, "at the exact same time and the
> exact same place" as Conley; it was behind him.

(Docket No. 106 at 3-4).  Thus, Conley argues, Conley "could
easily have been the figure that Walker saw being chased by Cox
(dressed in brown) and whom Cox observed to go over the fence in
front of him." (Docket No. 107 at 5).

## 2. Alleged Brady Violation

12

Whether evidence from Bullard and Cox's alleged movement toward the front of the Lexus could have provided an exculpatory gap in the government's case at trial is unclear in view of Bullard's testimony that Bullard lost track of Cox once Cox moved toward the front of the Lexus. This court need not speculate about the possible existence of such a "time lag" or "gap" in the government's case at trial, however, because defense counsel's underlying claim -- that Charles Bullard's testimony before the grand jury was the same as his testimony in the civil trial -- is not borne out by the evidence. In fact, Bullard's grand jury testimony was not the same as his civil trial testimony. Before the grand jury, Bullard testified that Cox "jumped out and went toward the right." (Docket 113, Exhibit 2). Before the grand jury, Bullard said nothing about Cox going forward to the front of the Lexus. In these circumstances, I cannot conclude that the government knew that Bullard would say Cox went to the front of the Lexus or that the government was in error in its determination before and during the criminal trial that Bullard's grand jury testimony was not evidence the government was required to disclose under Brady.

**3. Asserted Relevance of Bullard's Versions to Motion for New Trial Grounded on Newly Discovered Evidence**

In the civil trial, as noted above in Part C.1, Bullard testified that Michael Cox got out of the passenger side of the unmarked police cruiser and went forward toward the front of the

Lexus, and that he did not see Cox run toward the fence.  The
defense asserts that this undermines the credibility of the
government's theory of the case as it was presented to the jury
at the trial of Conley on criminal charges.  I take this
contention into account in Part V, below, concerning the merits
of the motion for a new trial grounded on newly discovered
evidence.

### D. The Alleged Perjury of Robert Brown

The defense claims that (1) Robert Brown perjured
himself during trial in stating that Massachusetts narcotics
charges pending against him were trumped up by the police in
retaliation for his testimony; (2) that the government knew
Brown's statements were perjurious because of a federal narcotics
investigation underway against Brown; and (3) that the prosecutor
solicited perjurious statements from Brown in direct examination
and relied on Brown's perjurious statements in his closing
argument.

At Conley's trial, Robert Brown was cross-examined
regarding narcotics charges pending against him in state court.

> Q. [Mr. Davis] Mr. Brown, there are charges currently
> pending against you; correct?
>
> A. [Mr. Brown] Yeah, because they gave me those charges.
> . . .
>
> Q. At least two of the charges pending against you in
> the state court charge you with possession with intent
> to distribute a controlled substance within a school
> zone?

14

A. Yes, that's the case that was given to me.

Q. You are aware of that, are you not?

A. Yes, I'm aware of it.

Q. And are you aware that if convicted of such offenses, you face a mandatory jail term of two years? You are aware of that; right?

A. Yes. They were aware of it, too.
Q. And those charges are still pending against you now
A. Yeah, over this case.

(Tr. Vol. II, pp. 148-153).

On redirect, the prosecutor attempted to get Brown to state more clearly his assertion of trumped up charges and retaliation by the police.

Q. [Mr. Merritt] Mr. Brown, do you have any deal, any promises, anything from the United States' Attorney's Office?

A. [Mr. Brown] No.

Q. And you testified at the Federal Grand Jury in April of 1997?

A. It was in April, yes.

Q. And how many times have you been arrested by the Boston Police Department since April of 1997?

A. Twice.

Q. And those are the, some of the charges that Mr. Davis asked you about, the pending charges?

A. Yes, one of them.  And the other one, assault and battery and disorderly.

Q. Assault and battery on a police officer?

A. Yes, and disorderly....

15

Q. What did you testify in April of 1997, Mr. Brown, with respect to what you saw happen at the fence when you looked back there?

A. A person coming over the fence getting hit over the head twice by a tall black officer, and then he was thrown to the ground and kicked and stuff.

Q. And at that time did you also testify with respect to the white plain clothes officer that you saw?

A. Yes....

Q. What did you testify about the white, plain clothes officer?

A. That he's the one that caught me.

Q. And did you testify any differently in the trial today than you testified in the Grand Jury with respect to that?

A. No, I didn't testify differently.

Q. And in your view, Mr. Brown, the arrest by the Boston Police Department since your being, testifying at the Grand Jury, in your view, are they connected at all to being a witness in this case?

     Mr. Davis: Objection.

A. Yes.

     The Court: Sustained....

Q. Mr. Brown, in your view, has your life been made harder or easier since you testified in the Grand Jury?

     Mr. Davis: Objection.

A. Harder.

     Mr. Davis: Objection.

     The Court: Wait a minute, wait a minute.
          Objection sustained.

(Tr. Vol. II, pp. 154-156).

In his closing argument, the prosecutor used Brown's claim of police retaliation and trumped up charges to shore up Brown's credibility.

> And not only is his testimony corroborated, think about this, he's got no motive to lie. You think he believes his life on the streets is going to be better or has been better with the Boston Police Department because of his participation in this case? You compare his motive to lie with the defendant's motive to lie at the Grand Jury. Which makes more sense to you?
>
> And maybe they do share some things in common, they both saw the beating. And they also share a concern, they don't want to get on the bad side of members of the Boston Police Department. But Cox - excuse me, Brown overcame that and he testified truthfully when he went to the Grand Jury. And when he did, think about it, that was in April of 1997, he told you that his testimony was the same as it was at trial. And he told you he's been arrested, he testified in the Grand Jury. It was the same testimony. And he also told you, and you have no evidence to the contrary despite Mr. Davis' suggestion, that he expects to get anything out of his testimony except more trouble, you can infer.

(Tr. Vol. IV, pp. 70-71).

In December 1999, Brown was indicted by federal authorities for one count of conspiracy to distribute cocaine, and two counts of distribution occurring on May 13, 1997, approximately one month after his Grand Jury testimony, and on March 4, 1998, approximately three months previous to his trial testimony. The defense counsel concludes:

> Federal authorities clearly had ample evidence of offenses occurring during the same time frame [as the state charges] which were, presumably, legitimate in

17

their view.  Standing before the jury and joining with
Brown in asserting that Brown was the victim of
harassment by Boston Police, was, at best, the same as
allowing perjured testimony to go uncorrected.  At
worst, it was knowingly eliciting false testimony.

(Docket No. 106 at 8).  The defense claims that this had an

impact on the trial in two respects.  First, it lent credibility

to Brown's testimony that Cox was chasing him, not Conley, toward

the fence.  Second, it "fed squarely into [the government's]

portrayal of the defendant as one who was lying so that he would

not be ostracized from the fraternity of his fellow officers."

(Docket No. 107 at 6).

In light of the defendant's allegations, I have

considered whether the defendant has shown that Brown did in fact

commit perjury, and if so, whether any reasonable likelihood

exists that the false testimony would have affected the judgment

of the jury.  See United States v. Torres, 128 F.3d 38, 49 (2nd

Cir 1997) (holding that where the newly discovered evidence is

the existence of allegedly perjured testimony, the defendant must

first demonstrate that perjury was in fact committed); Agurs, 427

U.S. at 103.

I conclude that the defendant has failed to show that

Brown's testimony was perjurious.  Proof that a federal

investigation, into crimes similar in nature to the Massachusetts

charges pending against Brown, did occur is not the equivalent of

proof that Brown lied when he claimed that the state charges were

18

bogus.  Also, it is questionable whether it would have been
appropriate in applying Federal Rules of Evidence 403, 404(b) and
608(b), to permit defense counsel to cross-examine Brown on the
federal drug investigation against him.

     Recent disclosures, during and after the civil trial,
about Robert Brown's testimony, however, may be material to
Conley's motion for a new trial in another way.  Information that
was first available to defense counsel through these disclosures
may count as newly discovered evidence that could have been used
to impugn Brown's credibility at the criminal trial, had defense
counsel known about them then.  I take this possibility into
account in evaluating the contention of newly discovered
evidence.

## E. Testimony of Richard Walker at the Trial of Criminal Charges Against Conley

     Richard Walker testified at the trial of defendant
Conley that Walker went through a hole in the fence and made his
way to the bottom of an incline.  Once at the bottom of the
incline, he saw two men standing in the street.  Walker described
them: "One was tall, about six-foot, six-foot two.  The other one
was shorter, about my height, five-nine." (Tr. Vol. II at 35-36).
The prosecutor used this testimony in his closing argument to
suggest that the taller man was Kenneth Conley. (Tr. Vol. II at
51).

In his March 27, 1995 testimony to the Internal Affairs
Division (IAD) of the Boston Police Department, Walker was shown
a group of photographs of members of the Boston Police Department
Anti-Gang Unit in an effort to identify the white plain clothes
officers at the bottom of the incline. Walker, with some
uncertainty, selected pictures of two men, neither of whom was
Conley or Dwan. (Docket 106, Exhibit 6). The defense claims that
the prosecutor had a copy of Walker's IAD testimony. The
prosecutor denies this. The defense counsel argues that the
prosecutor, in his closing argument, "once again asked the jury
to draw an inference that was not true." (Docket No. 106 at 10).
Defense counsel concludes that if the jury had known of Walker's
IAD testimony, they would have "(1) had reason to doubt Walker's
memory of events because it conflicts with his testimony at trial
that the tall white officer was the one that he followed and who
apprehended Brown; (2) would have given credibility to Conley's
account in which he indicated that he never stopped after going
over the fence after Brown, and (3) would have also detracted
from Brown's testimony in which he indicated that Conley gave
chase after him only after a delay in which Conley witnessed the
assault on Cox." (Docket No. 106 at 11).

The first question, under Wright, is whether the
evidence was unknown or unavailable to the defendant at the time
of trial. The defendant claims that he did not have access to
Walker or Walker's IAD testimony. The prosecution admits that it

did not provide defense counsel with a copy of Walker's March 27

IAD testimony.  The prosecution explains that the March 27 IAD

testimony was "inadvertently" not provided to the defendant as

pre-trial discovery material:

> [T]he [prosecutor] had never seen it before it was
> attached to defendant's motion and was unaware of its
> existence.  In its Automatic Discovery the government
> did provide a copy of a [different] undated IAD
> interview with Walker.  Although the prosecutor had
> requested IAD interviews of only certain witnesses and
> not the whole IAD file (because of potential problems
> to the ongoing investigation of potentially compelled
> statements created by Garrity v. New Jersey, 385 U.S.
> 493 (1967) and its progeny), it is not clear why this
> report was not furnished.

(Docket No. 112 at 32, n. 2).  The prosecutor responds, however,

that defense counsel was notified of the existence of the March

27 IAD interview.  On May 13, 1998, as part of the discovery in

the Michael Cox civil case against Conley and others, defense

counsel Davis received a copy of a list of tapes of IAD

interviews.  One of the taped interviews listed was Walker's

March 27, 1995 interview.  A tape of the interview was not

enclosed with the list. (Docket 113, Exhibit 15).  This

notification as part of discovery in another case, given only two

weeks before the criminal trial began, is inconclusive both on

the issue of the government's duty of and on the issue of defense

counsel's diligence in pursuing other potential avenues of

obtaining this information.  I leave these issues unresolved,

however, because I have decided on grounds that are entirely

independent of these unresolved issues that a new trial will be

granted and that no additional evidentiary hearing on conflicting charges of counsel against each other is in the public interest.


**V.   Merits of the Motion for New Trial Grounded on Newly Discovered Evidence**

**A.   A Generalized Formulation of the Most Promising Defense Argument for New Trial**

**1. Background Circumstances**

At the completion of a jury trial in June 1998, as noted earlier in this opinion, the jury found defendant guilty of one count of perjury before a grand jury and one count of obstruction of justice, also finding him not guilty of another count of perjury.

Defendant grounds his motion for new trial on a contention that "evidence discovered after trial, and withheld by the government prior to and during trial, would have seriously undermined the testimony of each" of three witnesses (Michael Cox, Richard Walker, and Robert Brown) on whose trial testimony the Court of Appeals "relied" in affirming the conviction. Docket No. 106 at page 2. Defendant adds the contention that "in the case of Brown and Walker, exculpatory evidence withheld from the defense allowed the government to purposely ask the jury to infer facts known by the prosecutor not to be true."


**B. Identification of Issues**

22

The evidence that defendant asserts to be newly discovered evidence is evidence received in the trial of a civil action "brought by Michael Cox against several officers, including the defendant" Conley.  That trial occurred in December 1998, "some six months after the defendant was convicted."  Id. at 3.  A contention that testimony that did not occur until more than six months after evidence was closed in the criminal trial was "withheld" from defense counsel by the prosecutor would be plainly lacking in merit.  A prosecutor cannot fairly be charged with withholding  something that does not exist.

Although the phrasing of the defense contention might be interpreted as making the plainly nonmeritorious contention stated in the preceding paragraph, I interpret the defense argument as asserting instead a proposition that may be stated, in generalized form, in the following way: the prosecutor had and withheld information that would have led a reasonable person to expect that the civil trial would occur and to expect that the testimony at the civil trial would be as we now know it was in fact, and that the prosecutor misbehaved in not so advising defense counsel.  Interpreted in this way, the defense contention is not so clearly out of bounds.  I proceed on the assumption I should examine it more closely, even though no precedent precisely on point has been cited by counsel or found by the court.  In examining this defense contention, I consider the entire record before me, as a whole.  That is, the focus is not

23

simply upon that newly discovered evidence that came out in the
civil trial, but as well upon all the conflicts and
contradictions in the record as a whole, now considered with the
newly discovered evidence before me.

My generalized formulation of the defense argument, as
presented in the preceding paragraph of this opinion, rephrased
for application to the distinctive circumstances of this case,
progresses in seven steps: (1) in the minds and in files of
police officers of the City of Boston and other federal, state,
and local officials (not counting, for the moment, the federal
prosecutor in this case) existed  information of a kind (2) that
would have led a reasonable person (3) to expect that the civil
trial would occur, (4) to expect that the testimony at the civil
trial would be as we now know it was in fact, (5) that the
federal prosecutor had and withheld information of this kind, (6)
that during the criminal trial (or even before that trial began)
the prosecutor had a legally cognizable duty of disclosure of
information of this kind to defense counsel, and (7) the
prosecutor's failure to disclose was misconduct requiring a new
trial.

Step (1) is an assertion of historical facts.  Facts of
this kind are also sometimes called basic facts. See, e.g.,
Thompson v. Keohane, 516 U.S. 99, 112-13 (1995)(observing in
context of confession taken without Miranda warnings that issues
involved more than "basic, primary or historical facts"); Markman

24

v. Westview Instruments, Inc., 517 U.S. 370, 388 (1996) (patent
law claim context); Miller v. Fenton, 474 U.S. 104, 114 (1985)
(habeas corpus context).  See also Keeton, Judging in the
American Legal System §§ 19.6.3(b), 19.7.3 (1999).  In this
instance, the precise nature of this assertion of historical
facts cannot be determined without first considering the legal,
factual, policy, and mixed legal-factual-policy propositions
identified in steps (2)-(4).

Step (2) invokes a legal proposition that establishes
an objective criterion of judgment, the concept of "a reasonable
person."  This objective criterion contrasts with subjective
criteria that depend on states of mind of various types,
including motive, purpose, intent, knowledge, and reckless
disregard, and in some instances forms of willfulness,
recklessness, and negligence.

Step (3) is a hypothetical rather than factual
expectation.  This is so because it is an expectation not of a
person (or natural person, as we sometimes say, to emphasize the
contrast with a hypothetical "reasonable person" established by
the legal proposition invoked in step (2).

Step (4) is an expectation that is hypothetical in
part, for the reason stated in the explanation of step (3).  It
is also factual in part because of the focus on what we now know
was in fact the testimony at the civil trial.

Step (5), like step (1), is an assertion of historical facts.  As with step (1), the precise nature of this assertion of historical facts cannot be determined without first considering the legal, factual, policy, and mixed legal-factual-policy propositions identified in steps (2)-(4).

Step (6) is strictly and solely a legal question.  In this instance, it is the core of this disputable defense contention for a new trial.  It is a legal proposition, as noted above, for which we have no precise guidance in existing law.  It is, in another familiar legal idiom, an issue of first impression.

Step (7) is the final answer, to be determined with the benefit of full consideration of all the first six steps.

## C.  A Federal Prosecutor's Duties of Disclosure

Because of the fundamental importance, both for this case and more generally, of the legal proposition identified in step (6) of the progression of reasoning on which the best defense contention in this case for new trial depends, I examine this legal proposition before considering other elements of the defense argument for new trial.

A thoughtful observer of the criminal justice system in the United States, and elsewhere, if writing on a clean slate, might reasonably propose an open-file practice in prosecutorial offices, either with or without some modification of the existing

26

practice of imposing very few obligations of disclosure or
compelled discovery on a person charged with criminal offenses.
The most compelling argument for such a practice is that justice
is done when an innocent defendant is acquitted as surely as
justice is done when a person proved beyond reasonable doubt to
be guilty is convicted.

No current observer of criminal justice, however, can
now write on a clean slate.

An observer who occupies some position of governmental
authority in any branch of a government, federal, state, or
local, is under constraints incident to respect for limits
imposed by concepts of jurisdiction, authority, and respect for
the roles and functions of other officials in the same or other
branches of the same or other governmental entities.

An observer who has no governmental authority must
nevertheless be sensitive to the fact that governmental action,
in some branch of some governmental entity, is an essential step
to effecting change.  Purely theoretical proposals may be useful
but cannot move us appreciably toward improvement if no proponent
is prepared to suggest means of  implementation through one or
another form of governmental action.

In the current American legal system, defendants in
criminal cases ordinarily have more access to evidence that will
aid them in defense against criminal charges than in most other
current legal systems around the world.  But their legally

enforceable rights fall short of a right of access to all the
information in the minds and files of  prosecutors.

        One of the legal generalizations that illustrates
constraints on the right of access is that a prosecutor in a
federal court ordinarily has no duty to create a document for a
defendant or his counsel, as distinguished from providing a copy
of an existing document or access to it.

## D. Allowance of a New Trial in the Interests of Justice

        For the reasons explained in Part V.A of this opinion,
among the potentially decisive questions to be considered in
deciding whether to grant a new trial in this case, grounded on
the claim of newly discovered evidence, are questions that may be
stated in the following form:

        Did the prosecution have and withhold information from
defense counsel that would have led a reasonable person to expect
that a civil trial would occur, similar to the civil trial that
did in fact occur after the criminal conviction and sentence in
this case, and that the testimony at the civil trial would be
substantially as we now know it was in fact?  If so, were defense
counsel so severely impeded in their preparation of an overall
defense strategy and in the performance of the function of cross-
examination of those particular witnesses, out of the larger
number of police officers, including both uniformed and
undercover officers, who were in the vicinity of the brutal

28

beating of Michael Cox, an undercover Boston policce officer, by a uniformed Boston police officer, that in the interests of justice a new trial should be allowed?

I find by a preponderance of the evidence that YES is the correct answer to the first question. In making this finding, I have taken into account not only the evidence in the public record of this case but also evidence that is before me under seal, and evidence not received at the trial of this case but called to my attention by the parties in their submissions as evidence accessible to the public as a result of media reports of the civil trial. In my present view, the evidence that I have considered that remains under seal at present should be placed on record in the Clerk's file in this case, open to public access, unless one or the other of the parties shows good cause for keeping it under seal. Because party interests or public interests of which I am not now aware may be implicated, however, this evidence now under seal will remain under seal until the parties have had an opportunity to be heard.

The role that this sealed evidence has served in my consideration of the motion for new trial grounded on newly discovered evidence flows from the following characteristics of that evidence.

First, it strengthens a bit the reasons for inferring that at least one Boston police officer (the one who brutally

struck Michael Cox from behind) knows the identity of the
attacker because he knows he did it himself.

Second, it dramatically strengthens the reasons for
inferring that one or more other Boston police officers saw the
attacker inflict one or more of the repeated blows Michael Cox
suffered.

Third, it dramatically strengthens the reasons for
inferring that one or more observers has refused to come forward
and disclose what he saw, out of a misguided purpose of
protecting a fellow police officer from consequences that would
flow from criminal charges of obstruction of justice and an
unworthy purpose of protecting against economic and other
consequences that would flow from internal police sanctions, loss
of status and authority in the Boston police force, and loss of
pay and benefits.

I find also that each of the first, second and third
inferences identified above is strongly supported by the conflict
in testimony that occurred at the Conley trial, explained in Part
IV.B of this opinion.  The newly discovered evidence, taken
together with all the conflicts presented in evidence known to
the defense before and during trial, presents a dramatically more
compelling basis for finding that defense counsel's opportunity
to present a creditable challenge to the government's case as a
whole and to cross-examine effectively particular witnesses was
severely impeded.

30

Having made these findings, I conclude that the answer
to the second question stated above cannot be determined as a
matter of law, under the applicable legal standard explained in
Part III of this opinion.   Instead, in the unique circumstances
of this case, I conclude that the determination to allow or not
to allow a new trial is one committed to an exercise of
discretion by the court to which the legal system assigns
responsibility for making the determination.

**E. Ruling**

In the exercise of discretion, for the reasons exlained
in Parts B-D, I determine that it is in the interests of justice
that a new trial be allowed.

**VI.   Issues Mooted by Allowance of New Trial on the Grounds
Explained in Part V**

Charges of opposing counsel, against each other, of
misconduct of counsel are not relevant to the grounds, as
explained in Part V of this opinion, on which a new trial is
allowed.

This determination moots also the requests of
prosecution and defense counsel respectively for evidentiary
hearings.   Because compelling affirmative reasons exist also for
not holding evidentiary hearings at which each side would be

31

asking the court to compel testimony of counsel on the other side and resolve disputes about whether the testimony given was perjurious, the respective requests of the parties for evidentiary hearings are denied.

### INTERLOCUTORY ORDER

For the foregoing reasons, it is ORDERED:

(1)   Defendant's Motion for New Trial (Docket No. 106) is ALLOWED.

(2)   Defendant's Motion for Reconsideration of Downward Departure (Docket No. 105) is DENIED.

(3) Motion to Continue Stay of the Execution of Sentence (Docket No. 104) is ALLOWED.

(4)   Requests of the prosecution and defense for evidentiary hearings are DENIED.

(5)   All other pending motions are declared moot in view of the allowance of a new trial.

(6)   The Clerk is directed to confer with counsel regarding a reasonably early and convenient date for a Case Management Conference for scheduling further proceedings.

United States District Judge